UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Glenn Hughes, | Civil No. 15-482 SRN/BRT |
| Plaintiff, | |
| v. | MEMORANDUM OPINION AND ORDER |
| Merchant e-Solutions, | |
| Defendant. | |

Christopher S. Naveja, Amstein & Lehr, LLP, 120 South Riverside Plaza, Suite 1200, Chicago, Illinois 60606; William M. Hart & Bradley J. Lindeman, Meagher & Geer, PLLP, 33 South Sixth Street, Suite 4400, Minneapolis, Minnesota 55402, counsel for Plaintiff.

Andrew J. Voss & Joseph D. Weiner, Littler Mendelson, PC, 80 South Eighth Street, Suite 1300, Minneapolis, Minnesota 55402, counsel for Defendant.

SUSAN RICHARD NELSON, United States District Judge

Before the Court is the Motion for a Preliminary Injunction [Doc. No. 10] filed by Defendant Merchant e-Solutions ("MeS"). After hearing oral argument on April 9, 2015, and in consideration of the submissions of the parties, the Court denies Defendant's motion for the reasons stated herein.

I.   BACKGROUND

Plaintiff Glen Hughes filed this action in February 2015 for breach of contract and contract reformation. Hughes alleges that in January 2000, he entered into an

1

independent contractor agreement with MeS's predecessor, Transcom, whereby Hughes was hired to solicit offers for credit card or bankcard processing services (the "Agreement"). (Compl. 7 [Doc. No. 1].) The Agreement described Hughes' powers and duties, Transcom's services, and Hughes' compensation. (Agreement §§ 2-4, Ex. 1 to Compl. [Doc. No. 1-1].) Up-front commissions and residual compensation were included in Hughes' compensation. (Id. § 4.) Section 6 of the Agreement included the following covenants made by Hughes to Transcom:

> (6)(b) During the term of this Agreement, you agree not to:
>
> (1) Represent any of Transcom's competitors in connection with any products and/or services while at the same time soliciting orders for us; and/or
>
> (2) Sell, rent or lease any other equipment while at the same time soliciting orders for us;
>
> (6)(c) During the term of this Agreement and for a period of twelve (12) months thereafter, you agree not to:
>
> (1) Call upon or solicit, either directly or indirectly, or engage any person or entity to call upon or solicit, any of our existing customers with regard to any service or product covered by this Agreement; and/or
>
> (2) Hire any person who prior to that time was an employee or IC of ours.
>
> (6)(d) In the event of a breach by you of any of the above covenants, you agree that monetary damages will be inadequate, that we may seek and obtain a temporary and/or permanent injunction, and to pay our costs and attorney's fees.
>
> (6)(e) You agree that if any loss to TPS is caused by your negligent or wrongful act, then we have full recourse to you and you shall be liable for one hundred percent (100%) of any such loss.

(Id. § 6.)

Hughes alleges that in December 2005, he and Mark Lewis, Transcom's President and CEO from 1999 to 2003, and General Manager of Transcom's assets and business from 2003 to 2006, agreed to amend the Agreement (the "Amendment"). (Compl. ¶¶ 8, 58; Amendment [Doc. No. 1-2].) Among other things, the Amendment specifically amends the provisions found in Section 6(b) of the Agreement. (Amendment at 1 [Doc. No. 1-2].) Plaintiff alleges that the intention of the parties with respect to the Amendment was that Hughes would no longer send new merchant account business to Transcom because Hughes was starting his own business, Matrix Payment Systems ("Matrix"). (Compl. ¶ 59 [Doc. No. 1].) However, he would continue to service his then-existing accounts that remained at MeS/Transcom and would continue to receive certain compensation related to those accounts. (Lewis Aff. ¶ 20 [Doc. No. 19].)

As an exhibit to the Complaint, Hughes filed the Affidavit of Mark Lewis, in which Lewis attested to his understanding of the Amendment, which is consistent with Hughes' allegations. (Lewis Aff., Ex. 6 to Compl. [Doc. No. 1-6].) Moreover, Lewis stated that he, on behalf of MeS/Transcom, and Hughes, doing business as Matrix, intended that the Amendment terminated the Agreement, such that the twelve-month covenants in Section 6 would start to run as of the execution of the Amendment in December 2005. (Id. ¶13.) To the extent that the Amendment does not clearly reflect the parties' intention, Hughes and Lewis attest that it was the result of mutual mistake. (Hughes Aff. ¶17 [Doc. No. 19]; Lewis Aff. ¶ 14 [Doc. No. 1-6].) Hughes therefore

seeks reformation of the contract to dissolve the non-solicitation covenant. (Id. ¶ 64.)

In support of his breach of contract claim, Hughes alleges that he was to continue to receive residual compensation per the terms of the Agreement as long as he continued to service his existing merchant accounts and those merchants continued to process credit transactions through MeS/Transcom. (Compl. ¶ 60 [Doc. No. 1].) Hughes sold merchant bankcard processing services for MeS/Transcom from 2000 through October 16, 2014. (Id. ¶¶ 19, 25.) Hughes contends that MeS breached the terms of the Agreement, as amended, by failing to pay him appropriate amounts and by charging him improper fees, damaging him in excess of $275,000. (Compl. ¶¶ 29-49 [Doc. No. 1].)

In response to the Complaint, MeS denies Plaintiff's allegations and asserts counterclaims for breach of contract, tortious interference with contract, tortious interference with business expectations and economic relations, unfair competition, misappropriation of trade secrets, unjust enrichment, equitable accounting, and injunctive relief. (Countercl., Counts I-VIII [Doc. No. 7].)

In the instant motion, Defendant argues that it did not release Hughes from the non-solicitation covenants. (Def.'s Mem. Supp. Mot. for Prelim. Injunction at 5 [Doc. No. 11].) To the contrary, MeS contends that other than dissolving the non-competition covenant in Section 6(b), the Agreement - including the non-solicitation covenants in Section 6(c) - remained in force until MeS terminated it in October 2014. MeS contends that Hughes violated, and continues to violate, the Agreement's non-solicitation covenants as to both customers and employees, because the twelve-month period does not

4

expire until October 2015.  (Id.)

In support of its motion, MeS submits the Declaration of Robert Butler, Executive Vice President of Sales for MeS.  (Butler Decl. [Doc. No. 12].)  Butler asserts that in early 2014, MeS discussed the renegotiation of its agreements with its independent contractors, including Plaintiff.  (Id. ¶ 3.)  With respect to Hughes, Butler contends that Hughes held multiple discussions with other independent contractors regarding the renegotiations.  (Id. ¶ 4.)  During these discussions, Butler alleges that Hughes made misrepresentations concerning MeS and encouraged the independent contractors, including Leslie Banyard, not to renegotiate their agreements with MeS.  (Id.)  As a result, Butler contends that several of the independent contracts decided against renewing their agreements with MeS and instead decided to work with Hughes' company, Matrix.  (Id. ¶¶ 5-6.)   Butler further asserts that Hughes and Banyard have not only continued to actively solicit MeS' independent contractors, they have also solicited MeS' customers -- all in violation of the terms the Agreement.  (Id. ¶¶ 6-12.)  Despite statements to the contrary from Transcom's former CEO Lewis, Defendant contends that it never intended to release Hughes from the Agreement's non-solicitation covenants.  (Id. ¶ 15.) Moreover, Butler asserts that Lewis was not authorized to contract for any terms not reflected in the written agreement and that the Agreement prohibited any non-written modifications.  (Id.)  Based on the alleged conduct of Hughes, MeS estimates a loss of gross revenue in excess of $100,000,000 over a three-year period.  (Id. ¶ 14.)  Butler also asserts that in addition to the economic loss MeS has suffered, it has sustained injury to

its good will, and will continue to do so if Plaintiff's conduct is not enjoined. (Id. ¶ 16; Def.'s Mem. Supp. Mot. for Prelim. Injunction at 8-9 [Doc. No. 11].) MeS therefore seeks a preliminary injunction enjoining Hughes from: (1) violating the Agreement's restrictive covenants as to solicitation of MeS customers for a period of one year from the date of entry of the injunction; (2) violating the Agreement's restrictive covenant as to the solicitation of MeS employees or independent contractors to work for Hughes or Matrix; and (3) interfering with or improperly affecting any contractual relationship between MeS, its customers, employees, and independent contractors. (Def.'s Mot. for Prelim. Injunction at 1-2 [Doc. No. 10].) Absent entry of a injunction, Defendant contends that the one-year period of restriction will expire on October 15, 2015.

## II.   DISCUSSION

This Court must consider four factors to determine whether preliminary injunctive relief is warranted: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm injunctive relief would cause to the other litigants; and (4) the public interest. Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc); accord Watkins, Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003) (quoting Dataphase). To analyze these factors, the Court must "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999). A preliminary injunction "is an

extraordinary remedy never awarded as a matter of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24.  The burden of establishing the four Dataphase factors lies with the party seeking injunctive relief.  Watkins, 346 F.3d at 844.

### A. **Likelihood of Success**

In order to obtain a preliminary injunction, MeS must show that it has a "fair chance of prevailing" in this suit.  Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008).  "An injunction cannot issue if there is no chance on the merits."  Mid-Am. Real Estate Co. v. Ia. Realty Co., 406 F.3d 969, 972 (8th Cir. 2005).  However, the question is not whether the movant has "prove[d] a greater than fifty percent likelihood that [it] will prevail," PCTV Gold, Inc. v. SpeedNet, LLC, 508 F.3d 1137, 1143 (8th Cir. 2007), but rather whether any of its claims provide a "fair ground for litigation," Watkins, 346 F.3d at 844.  "In considering the likelihood of the movant prevailing on the merits, a court does not decide whether the movant will ultimately win." PCTV Gold, 508 F.3d at 1143.

The evidence currently before this Court does not suggest that one party has a greater likelihood of prevailing over the other.  If the non-solicitation covenants have long since ceased to be in effect, as Plaintiff contends, then there is no basis for Defendant's requested injunctive relief.  While Defendant argues that Hughes' arguments about the parties' intent are irrelevant because the Agreement required all changes or modifications to be in writing, Plaintiff responds that MeS itself breached the terms of the Agreement by failing to pass on certain compensation to as early as 2010.  (Hughes Aff. ¶ 33.)  The

difficulty at this time is that only a limited record, and a conflicting one, at that, is before the Court.

MeS relies on the Butler Declaration in support of its motion, however, Plaintiff raises valid concerns about the admissibility of the Butler Declaration in evidence.[1] In addition, the Butler Declaration focuses primarily on Hughes' conduct from 2014 forward, providing little information about the Agreement. Nor has Defendant submitted sworn affidavits from merchants or customers in support of Defendant's claim that Hughes has solicited its customers. Instead, as an exhibit to its Reply Memorandum, MeS attaches emails between MeS employees that forward an email from an MeS customer to an MeS employee that, in turn, forwards emails between Hughes and the MeS customer in which Hughes provides a competitive bid for services. (Email Exchange, Ex. 1 to Hearn Decl. [Doc. No. 22-1].) Even setting aside questions about the admissibility of Defendant's evidence, the evidence is countered by Plaintiff's evidence. Defendant also argues that the conduct of the parties supports its position, but such conduct can likewise be viewed to support Plaintiff's position, since Hughes and other former MeS independent contractors began working for Matrix long before 2014, and MeS took no action against them.

Plaintiff submits the Lewis Affidavit and Second Lewis Affidavit, as well as his

---

[1] Butler was not working at MeS during the applicable time period. Instead, Butler relies on his role as the supervisor of Ryan O'Connor, who apparently was also not working at MeS during the applicable time period. (See Butler Decl. ¶ 1 [Doc. No. 12].) Butler asserts that he reviewed certain emails in order to make his declaration (id. ¶ 2), but the emails are not attached to the Butler Declaration.

own affidavit. As the former CEO and President of Transcom at the time in question, Lewis attests that he had the authority to enter into and modify contracts, including independent contractor agreements. (Second Lewis Aff. ¶ 5 [Doc. No. 18].) Lewis contends that on behalf of Transcom, he understood and agreed that certain Transcom independent contractors were to join Hughes at Matrix in 2005 and would no longer bring new business to MeS. (Id. ¶ 8.) Moreover, when several of those independent contractors began working with Matrix in 2005, Lewis attests that "it was our intention that this would not be a breach of the Agreement." (Id. ¶ 10.) Moreover, Lewis asserts that he and other senior officers and managers at MeS/Transcom, identified by name in the Second Lewis Affidavit, "all knew that Hughes was starting his own [independent sales organization]" and understood that neither Hughes nor the other independent contractors would be sending any new business to MeS/Transcom. (Id. ¶ 11.) Hughes' affidavit confirms many of Lewis' statements and further states that many of the independent contractors identified by MeS have booked no merchant accounts with Matrix, although three have booked some merchant accounts. (Hughes Aff. ¶ 15 [Doc. No. 19].)

While a party asserting a contract reformation claim faces a heavy burden, see Theisen's, Inc. v. Red Owl Stores, Inc., 243 N.W.2d 145, 148 (Minn. 1976), Defendant may likewise face difficulties in prosecuting its eight counterclaims, all of which essentially relate to the contractual relationship between the parties. Based on the very limited record before the Court at this time, and the conflicting evidence, noted above, it

is impossible to determine the likelihood of success on the merits.  Accordingly, this factor is indeterminate under the Dataphase test.

### B.     Irreparable harm

"The basis of injunctive relief in the federal courts has always been irreparable harm and the inadequacy of legal remedies."  Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924, 926 (8th Cir. 1999) (per curiam) (quoting Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506–07 (1959)).  Because non-solicitation agreements partially restrain trade, Minnesota courts strictly construe such agreements, enforcing them only to the extent reasonably necessary to protect a legitimate business interest.  FSI Int'l, Inc. v. Shumway, No. 02-402 (RHK/SRN), 2002 WL 334409, at *7 (D. Minn. Feb. 26, 2002) (citing Webb Publ'g Co. v. Fosshage, 426 N.W.2d 445, 450 (Minn. Ct. App. 1988)). However, Minnesota courts have recognized that irreparable harm may be inferred from the breach of a valid and enforceable restrictive covenant. See Alside, Inc. v. Larson, 220 N.W.2d 274, 278 (Minn.1974).  Such an inference may arise where the former employee obtains a personal hold on the good will of the former employer's business.  Webb Publ'g, 426 N.W.2d at 448.  This inference may likewise be rebutted by evidence to the contrary.  Id.  But where clients cease to do business with the former employer, take their business to the former employee, and the damages resulting from the loss of these clients can be calculated, money damages may be an adequate remedy for the breach of a non-solicitation agreement, particularly where the other alleged damages are speculative.  See Guy Carpenter & Co., Inc. v. John B. Collins Assocs., Inc., 179 Fed. App'x 982, 983 (8th

Cir. 2006).

While Defendant asserts lost customer good will and revenue based on allegations of Hughes' solicitation of customers and employees, if the non-solicitation covenants expired as of 2005 or 2006, there would be no basis for the requested injunctive relief and no irreparable harm.  In addition, there are fact questions here concerning Plaintiff's alleged solicitation of customers and any resulting injury to Defendant's good will.  Again, because the Court cannot determine at this time whether the non-solicitation covenants remain in effect, irreparable harm likewise cannot be established.

### C.     Remaining Dataphase Factors

Finally, the Court considers the remaining Dataphase factors - the balance of harms and the public interest.  Defendant argues that financial harm and loss of customer relationships will accompany this Court's ruling should the Court deny the motion.  And Plaintiff argues that similar injury will befall it should the Court grant the motion.  Clearly, both sides face the risk of serious harm such that the balance of harms does not weigh in favor of either party.  Similarly, as to the public interest, the Court finds that this factor is not dispositive, given the competing interests at stake.  While "the public interest is served by upholding valid restrictive covenants," Millard v. Electronic Cable Specialists, 790 F. Supp. 857, 863 (D. Minn.1992), the public interest also is served by permitting persons to earn a living and pursue a career.  As Minnesota courts have long recognized, "'[o]ne who has nothing but his labor to sell, and is in urgent need of selling that, cannot well afford to raise any objection to any of the terms in the contract of

employment offered him, so long as the wages are acceptable.'"  Klick v. Crosstown State Bank of Ham Lake, 372 N.W.2d 85, 87 (Minn. Ct. App. 1985) (quoting Menter Co. v. Brock, 180 N.W. 553, 555 (1920)).

In conclusion, the Court finds that the equities do not weigh in favor of issuance of a preliminary injunction.  Injunctive relief is an extraordinary remedy, requiring the moving party to meet a heavy burden.  Winter, 555 U.S. at 24.  The undeveloped record currently before the Court fails to demonstrate that such relief is warranted.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

Defendant's Motion for a Preliminary Injunction [Doc. No. 10] is **DENIED**.

Dated:   June 4, 2015                                        s/Susan Richard Nelson
                                                                            SUSAN RICHARD NELSON
                                                                            United States District Judge